**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**AMBER DAWN LOWTHER,**

                    Plaintiff,

**v.**                                                       **CIVIL ACTION NO.: 3:16-CV-113
                                                           (GROH)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

                    Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On July 26, 2016, Plaintiff Amber Dawn Lowther ("Plaintiff"), through counsel

Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin,[1] Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On October 4, 2016, the

Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 8; Admin. R., ECF No. 9). On October 28, 2016, and December 20, 2016,[2]

Plaintiff and Defendant filed their respective Motions for Summary Judgment and

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the
Acting Commissioner of Social Security.
   [2] On November 15, 2016, the Commissioner filed a Motion [ECF No. 14] for an
extension of time in which to file her motion for summary judgment. On November 16, 2016, the
Court entered an Order [ECF No. 15] granting the Motion and extending the Commissioner's
deadline to December 28, 2016. Because the Commissioner filed before this date, her Motion
for Summary Judgment and supporting brief are deemed timely filed.

supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 16). On December 28, 2016, Plaintiff filed a Response to Defendant's supporting brief. (Pl.'s Resp., ECF No. 20). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On August 10, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI") benefits. (R. 15, 183, 190). In both applications, Plaintiff alleges disability that began on June 12, 2012. (Id.). Plaintiff's claims were initially denied on March 20, 2013, and denied again upon reconsideration on June 18, 2013. (R. 115, 128). After these denials, Plaintiff filed a written request for a hearing. (R. 134).

On December 8, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Terrence Hugar in Morgantown, West Virginia. (R. 15, 29, 35, 148). Plaintiff, represented by Mr. Bailey, appeared and testified, as did Linda Dezack, an impartial vocational expert. (R. 15, 35, 52, 174). On January 22, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 12). On June 30, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

### III.   BACKGROUND

**A.   Personal History**

Plaintiff was born on January 18, 1986, and was twenty-six years old at the time she filed her claims for DIB and SSI benefits. (See R. 27). She is 5'8" tall and weighs approximately 135 pounds. (R. 209). She lives in a house with her boyfriend and eight-year-old son. (R. 39-41). She obtained a GED in 2004 and has received training as a certified nursing assistant. (R. 210). Her prior work experience includes working as a certified nursing assistant in a nursing home, home healthcare provider for a home healthcare business and marina attendant for a resort. (Id.). She alleges that she is unable to work due to a brain injury. (R. 209).

**B.   Medical History**

**1.   Medical History Post-Dating Alleged Onset Date of June 12, 2012[3]**

On June 12, 2012, Plaintiff was involved in a motor vehicle accident. (R. 273). Plaintiff was the passenger of a vehicle that collided with a bridge at a speed "greater than 45 mph." (R. 271). Plaintiff lost consciousness and was taken to Stonewall Jackson Hospital, where she was intubated and transferred to Ruby Memorial Hospital. (R. 271, 273). At Ruby Memorial Hospital, Plaintiff was diagnosed with a traumatic brain injury, right knee soft tissue injury with joint effusion and "reticulation about the knee," left mandible fracture, left second rib fracture and right hip dislocation. (See R. 271, 273, 398, 400-01, 438, 443, 447). Plaintiff was admitted to the intensive care unit and underwent closed reduction of her dislocated right hip. (R. 274-75, 448, 526). A CT scan of her head was obtained, which revealed subarachnoid hemorrhaging and diffuse

---

[3] Plaintiff did not submit any medical records pre-dating the alleged onset date of June 12, 2012.

axonal injury. (R. 271, 403, 405, 407, 429). As a result, she underwent burr hole surgery and had an intracranial pressure monitor surgically inserted into her head. (R. 276). Subsequently, Plaintiff underwent a PEG tube insertion for nutritional purposes. (R. 287-88).

Plaintiff remained hospitalized for over a month. (See R. 271, 447). On July 16, 2012, she was discharged to Shepherd Center, Inc., in Atlanta, Georgia, for traumatic brain injury rehabilitation. (R. 271, 518). Her treatment notes indicate that:

> [At the time of her] discharge [from Ruby Memorial Hospital, Plaintiff] was tolerating a regular diet, her pain was well controlled on oral pain medications, and she was ambulating well and physical therapy felt she was safe for discharge.

(R. 275).

Plaintiff underwent rehabilitation at the Shepherd Center for the remaining weeks of July. At the Shepherd Center, Plaintiff underwent "aggressive speech therapy." (R. 526). She also received orthopedic and neuropsychological consults. (R. 531, 535-36). After the orthopedic consult, Plaintiff was diagnosed with a right knee sprain and apparent cruciate instability. (R. 531). Plaintiff initially wore a knee immobilizer during her rehabilitation but it was later discontinued. (R. 527). No surgical intervention was deemed necessary. (Id.). After the neuropsychological consult, performed by Adam B. Warshowsky, Ph.D., Plaintiff was diagnosed with a cognitive disorder and an adjustment disorder with anxiety. (R. 536). Plaintiff was started on Celexa for her adjustment disorder. (R. 527). It was also documented that Plaintiff was "not cognitively capable [of] return[ing] to work at this time" but that her care providers were "hopeful that she will return to work in the future." (R. 536).

On July 31, 2012, Plaintiff was discharged from the Shepherd Center. (R. 526). At the time of discharge, Plaintiff was acting independently in her care unit, without any safety restrictions. (R. 527). However, it was noted that she would "require supervision after discharge" and it was recommended that she live with her parents. (R. 526-27). It was further noted that Plaintiff "continued to have very poor insight at the time of discharge" and that she would require continued physical, occupational and speech therapy on an outpatient basis once home. (Id.). Plaintiff's only medication upon discharge was Motrin for pain.[4] (R. 527). She was instructed not to operate a motor vehicle "until re-evaluation by a professional." (Id.).

On August 6, 2012, Plaintiff presented to the West Virginia University ("WVU") Orthopaedics Department for a consultation. (R. 517). Mark Floyd, M.D., a resident physician supervised by George K. Bal, M.D.,[5] performed the evaluation. (R. 517-19). Initially, Dr. Floyd noted that Plaintiff was "doing much better from a head injury standpoint." (R. 518). Dr. Floyd then documented that Plaintiff complained of continuing memory and attention issues, voice difficulties stemming from "her vocal cord injury" and neck pain. (Id.). Dr. Floyd further documented that Plaintiff complained of occasional right hip pain and a painful, unstable right knee. (Id.). Dr. Floyd diagnosed Plaintiff with a traumatic brain injury, right hip dislocation status post reduction and right knee pain with a possible anterior cruciate ligament ("ACL") tear. (Id.). Dr. Floyd noted that Plaintiff was already prescribed naproxen and additionally prescribed diclofenac for

---

[4] At the Shepherd Center, Plaintiff was noted to have a "drug history." (R. 527). Therefore, the Center was hesitant to prescribe opioid-based pain medication and advised "very careful consideration" of future health care providers before prescribing such a medication. (Id.).
[5] Dr. Bal affirmed all of Dr. Floyd's notes and conclusions. (R. 517-19).

her pain. (Id.). Dr. Floyd also ordered that Plaintiff participate in physical therapy as planned. (Id.).

On August 7, 2012, Plaintiff presented to Therapy Services, LLC, for an initial evaluation. (R. 553, 577). At the conclusion of the evaluation, it was recommended that Plaintiff participate in occupational therapy once a week for three months and physical therapy twice a week for eight weeks.[6] (R. 553, 579). On August 10, 2012, it was recommended that Plaintiff participate in speech therapy twice a week with Therapy Services. (R. 612).

On August 30, 2012, Plaintiff returned to the WVU Orthopaedics Department for a follow-up appointment. (R. 659). During this appointment, Plaintiff continued to complain of right knee pain and stated that "her physical therapist pretty much told her there is nothing more she could offer her." (Id.). An MRI of her right knee was ordered, which revealed a posterior cruciate ligament tear and patellar tendinosis. (R. 660). Therefore, Plaintiff was diagnosed with, *inter alia*, a medial meniscal tear. (R. 659). Plaintiff was scheduled for a right knee arthroscopy with meniscal debridement. (Id.). On September 14, 2012, Dr. Bal performed the surgery. (R. 664-66). Plaintiff was prescribed Percocet and Naprosyn for her post-operative pain. (R. 667). On September 24, 2012, Dr. Bal documented that Plaintiff had "significantly improved since surgery." (R. 676). Dr. Bal further documented that Plaintiff was ambulating independently and that her pain was controlled without medication. (Id.).

---

[6] Plaintiff participated in occupational and physical therapy throughout August and September of 2012. (R. 570-74, 557, 575-76, 594, 601, 603, 606-07). On or about September 25, 2012, Plaintiff was discharged from occupational/physical therapy and instructed to start a home exercise program. (R. 569, 596).

On October 12, 2012, Plaintiff presented to a WVU Healthcare emergency room in Morgantown, West Virginia. (R. 626). Plaintiff stated that she had been "doing well up until early this week," when she started experiencing intermittent double vision with headaches and dizziness. (Id.). It was documented that Plaintiff had underwent a CT scan of her head at Stonewall Jackson Memorial Hospital a few days prior, the results of which were normal. (Id.). After an examination, Plaintiff was diagnosed with post-concussion syndrome and referred to a neurologist. (R. 628).

On October 22, 2012, Plaintiff presented to the WVU Orthopaedics Department, complaining of right shoulder pain. (R. 677). Plaintiff stated that several months of physical therapy had not provided her "much relief." (Id.). After an examination, Plaintiff was diagnosed with adhesive capsulitis of the right shoulder. (Id.). It was documented that, "[a]s far as the knee goes, she is doing very well." (Id.). Plaintiff was ordered to continue "aggressive physical therapy both for the knee and for the shoulder." (Id.). She was also prescribed diclofenac for her pain. (Id.). On January 3, 2013, during a follow-up appointment, it was documented that, "[o]verall, [Plaintiff] has continued to improve. We are pleased with her improvement in range of motion of the shoulder. We do think she should continue with physical therapy . . . . We will have her progress her activities . . . ." (R. 678-79).

On March 12, 2013, Plaintiff presented to the office of Shiv U. Navada, M.D., a neurologist. (R. 654-56). During this visit, Plaintiff complained of, *inter alia*, occasional feelings of vertigo. (R. 654-55). After an examination, Dr. Navada diagnosed Plaintiff with mixed headaches, mild memory impairment and positional vertigo status post a closed head injury. (R. 655). Dr. Navada documented that he was reluctant to prescribe

a medication for Plaintiff's headaches "as she has cognitive impairment and . . . her headaches are relatively mild." (Id.). Therefore, Dr. Navada ordered a MRI of Plaintiff's head. (Id.). Subsequently, Dr. Navada also ordered an electroencephalogram ("EEG"), the results of which were "[e]ssentially normal." (R. 682).

On March 14, 2013, Plaintiff returned to the WVU Orthopaedics Department for a follow-up appointment. (R. 680). During this appointment, it was documented that Plaintiff was no longer experiencing pain in her right knee, although she had noticed some swelling. (Id.). However, Plaintiff continued to complain of pain in her right shoulder and was diagnosed with, *inter alia*, right shoulder pain with possible labral pathology. (Id.). An MRI arthrogram of Plaintiff's right shoulder was ordered. (Id.). Plaintiff was also ordered to wear compression hose to treat her right knee swelling. (Id.).

On July 8, 2013, Plaintiff presented to Dr. Navada's office for a follow-up appointment. (R. 684). During this appointment, Plaintiff complained of headaches, cold hands and legs and a poor appetite. (Id.). Initially, Dr. Navada noted that Plaintiff's medication regimen consisted of Ambien, to aid sleeping, and venlafaxine for her mental impairments. (Id.). Then, after an examination, Dr. Navada diagnosed Plaintiff with emotional lability and mixed headaches. (Id.). Dr. Navada opted not to prescribe a medication for Plaintiff's headaches because ibuprofen was "[u]sually" effective at treating them. (Id.). As for Plaintiff's complaints of bilateral hand and leg coldness, Dr. Navada told her that it would "improve with time." (Id.). Finally, Dr. Navada provided Plaintiff with an optional referral to a tertiary care center. (Id.). On November 5, 2013, during another follow-up appointment, Dr. Navada documented that Plaintiff was taking

Lyrica as needed for her headaches and that she was instructed to "use [it] sparingly." (R. 686).

On March 25, 2014, Plaintiff presented to the office of Mike Gregory, D.O., to establish care. (R. 691). During this visit, Plaintiff complained of "freaking out" episodes. (Id.). After an examination, Dr. Gregory diagnosed Plaintiff with a closed traumatic brain injury, anxiety/depression, environmental allergies and insomnia. (R. 692). Dr. Gregory instructed Plaintiff to stop taking venlafaxine and start Zoloft instead for her anxiety/depression. (Id.). He then prescribed cetirizine for her allergies and noted that she was taking Ambien for her insomnia. (Id.).

On May 16, 2014, Plaintiff returned to Dr. Gregory's office, stating that she had injured her knee "trying to kickstart a dirt bike." (R. 688). After an examination, Dr. Gregory diagnosed Plaintiff with knee pain. (R. 689). While he did not prescribe any pain medication, Dr. Gregory increased Plaintiff's Zoloft dosage after noting that Plaintiff had "self increased to 100mg" and was "doing well" on that dose. (R. 688-89).

On May 23, 2014, Plaintiff presented to the emergency room at Stonewall Jackson Memorial Hospital, complaining of a mild right knee injury. (R. 694). Plaintiff stated that she had sustained the knee injury the previous evening when she had been riding a dirt bike with her son. (Id.). An X-ray of Plaintiff's right knee was ordered. (R. 698). Because no fractures were seen on the X-ray, Plaintiff was diagnosed with, *inter alia*, a ligamentous right knee sprain. (Id.). Plaintiff was instructed to wear a knee immobilizer on her right knee. (Id.).

### 2. Medical Reports/Opinions

#### a. Psychological Evaluation by Robert J. Klein, Ed.D., September 10, 2012

On September 10, 2012, Robert J. Klein, Ed.D., a licensed psychologist, performed a Psychological Evaluation of Plaintiff. (R. 546-51). Initially, Dr. Klein noted that the Psychological Evaluation was intended "to assess, by using approved psychometric procedures,[7] [Plaintiff's] present mental status since the accident of 6/12/12." (R. 546). After performing the psychometric procedures, Dr. Klein diagnosed Plaintiff with an adjustment disorder and with anxiety and depression. (R. 551). Dr. Klein recommended that Plaintiff discuss the results of the Psychological Evaluation with her primary care physician and comply with any resulting treatment changes. (Id.).

#### b. Disability Determination Examination by Bennett Orvik, M.D., January 20, 2013

On January 20, 2013, Bennett Orvik, M.D., a state agency medical consultant, performed a Disability Determination Examination of Plaintiff. (R. 635-39). The Disability Determination Examination included a physical examination of Plaintiff. (R. 637-38). This examination revealed mostly normal findings. (See id.). In fact, when summarizing his findings, Dr. Orvik declared that the "[p]hysical examination is mostly unremarkable with the exception of mild decrease in her motion of right shoulder." (R. 638).

After completing the Disability Determination Examination, Dr. Orvik determined that Plaintiff suffers from: (1) status post severe traumatic brain injury; (2) depression and (3) history of right hip dislocation. (Id.). Regarding Plaintiff's current treatment and prognosis, Dr. Orvik noted that Plaintiff's treatment "appears to be generally

---

[7] Dr. Klein noted that the psychometric procedures were subjective and would reflect "how [Plaintiff] sees herself." (R. 551).

appropriate" and that her prognosis "is probably good in the long term." (Id.). Dr. Orvik further noted that "[h]opefully, some time in the near future, [Plaintiff] will be able to return to some type of employment." (R. 639).

### c. Disability Determination Explanation by Atiya M. Lateef, M.D., January 25, 2013

On January 25, 2013, Atiya M. Lateef, M.D., a state agency consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 61-72). In the Initial Explanation, Dr. Lateef opined that Plaintiff suffers from the following severe impairments: cerebral trauma and dysfunction of the major joints. (R. 66). Dr. Lateef further opined that Plaintiff suffers from the following non-severe impairments: anxiety disorders and organic mental disorders. (Id.).

In the Initial Explanation, Dr. Lateef completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 68-70). During this assessment, Dr. Lateef found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Lateef found that Plaintiff is able to: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday and push and/or pull with no limitations. (R. 68). Regarding Plaintiff's postural limitations, Dr. Lateef found that Plaintiff is able to frequently climb ramps/stairs, stoop, kneel, crouch and crawl. (R. 69). However, Dr. Lateef further found that Plaintiff is only able to occasionally balance and is never able to climb ladders/ropes/scaffolds. (Id.). Regarding Plaintiff's environmental limitations, Dr. Lateef found that, while Plaintiff need not avoid extreme cold, extreme

heat, wetness, humidity, noise, vibration or "[f]umes, odors, dusts, gases, poor ventilation, etc.," she must avoid concentrated exposure to hazards. (Id.). After completing the RFC assessment, Dr. Lateef determined that Plaintiff is able to perform light-exertional work. (R. 71).

Also in the Initial Explanation, Bob Marinelli, Ed.D., another state agency consultant, completed a Psychiatric Review Technique form. (R. 66). On this form, Dr. Marinelli analyzed the degree of Plaintiff's functional limitations caused by her anxiety-related disorders.[8] (Id.). Specifically, Dr. Marinelli rated Plaintiff's restriction in her activities of daily living as "mild." (Id.). Likewise, Dr. Marinelli additionally rated Plaintiff's limitations in maintaining social functioning and difficulties in maintaining concentration, persistence or pace as "mild." (Id.). Finally, Dr. Marinelli rated Plaintiff's episodes of decompensation as "none." (Id.).

### d.  Mental Status Examination by Wilda Posey, M.A., January 28, 2013

On January 28, 2013, Wilda Posey, M.A., a state agency psychologist, performed a Mental Status Examination of Plaintiff. (R. 642-47). The Mental Status Examination revealed largely normal findings. (See id.). When summarizing the findings, Ms. Posey declared that Plaintiff's: concentration was average; persistence was normal and pace was varied. (R. 647). Ms. Posey further declared that Plaintiff's immediate memory was normal but that her recent memory was moderately deficient. (Id.). After completing the Mental Status Examination, Ms. Posey diagnosed Plaintiff

---

[8] Dr. Marinelli stated that the record contained insufficient evidence to evaluate the functional limitations caused by Plaintiff's organic mental disorders. (R. 67). On February 12, 2013, H. Hoback Clark, M.D., a state agency medical consultant, performed a Case Analysis and agreed that there was "insufficient [evidence] for adjudication." (R. 649-50). Therefore, Dr. Clark requested additional medical records and a completed third-party ADL form. (R. 650).

with an adjustment disorder with anxiety. (R. 646). She opined that Plaintiff's prognosis is "[g]ood with treatment." (Id.).

### e. Disability Determination Explanation by Porfirio Pascasio, M.D., June 13, 2013

On June 13, 2013, Porfirio Pascasio, M.D., a state agency consultant, prepared the Disability Determination Explanation at the Reconsideration Level (the "Reconsideration Explanation"). (R. 85-98). In the Reconsideration Explanation, Dr. Pascasio disagreed with one of Dr. Lateef's findings from the Initial Explanation. (See R. 61-72, 85-98). Specifically, Dr. Pascasio characterized Plaintiff's anxiety disorders and organic mental disorders as severe, not non-severe, in nature. (R. 90).

Also in the Reconsideration Explanation, Karl G. Hursey, Ph.D., another state agency consultant, reviewed Dr. Marinelli's Psychiatric Review Technique form from the Initial Explanation. (R. 90-91). While Dr. Hursey largely agreed with Dr. Marinelli's findings, he dissented on a few issues. (See R. 66, 90-91).Specifically, Dr. Hursey opined that Plaintiff's anxiety-related disorders cause moderate, not mild, difficulties in maintaining concentration, persistence or pace. (R. 91). Dr. Hursey also opined that a mental RFC assessment was warranted. (R. 95-96). After performing this assessment, Dr. Hursey found that, while Plaintiff does not possess sustained concentration and persistence limitations or social interaction limitations, she possesses understanding and memory and adaptation limitations. (Id.). Regarding Plaintiff's understanding and memory limitations, Dr. Hursey found that Plaintiff is not significantly limited in her abilities to: (1) remember locations and work-like procedures or (2) understand and remember very short and simple instructions. (R. 95). However, Dr. Hursey further

found that Plaintiff is moderately limited in her ability to understand and remember detailed instructions. (Id.).

Regarding Plaintiff's adaptation limitations, Dr. Hursey determined that, while Plaintiff is not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, she is moderately limited in her abilities to: (1) respond appropriately to changes in the work setting; (2) travel in unfamiliar places or use public transportation and (3) set realistic goals or make plans independently of others. (R. 95-96).

### f. Neuropsychological Evaluation by Jason Chong, Psy.D., November 1, 2014

On November 1, 2014, Jason Chong, Psy.D., performed a Neuropsychological Evaluation of Plaintiff. (R. 713-20). Initially, Dr. Chong noted that Plaintiff "was referred [to him] by her attorney . . . based on a recommendation for re-evaluation by Dr. Adam Warshowsky." (R. 713). During the Neuropsychological Evaluation, Plaintiff participated in various neuropsychological testing. (R. 716-17). After the testing was complete, Dr. Chong diagnosed Plaintiff with a cognitive disorder, secondary to her traumatic brain injury, and a mood disorder. (R. 720). When concluding his report of the Neuropsychological Evaluation, Dr. Chong stated:

> In summary, comparison of [Plaintiff's] performance on previous neuropsychological testing . . . indicates some level of improvement . . . . However, given that she is now 2-1/2 years post injury she has exceeded the point of maximum medical recovery . . . and her residual deficits with executive functioning, processing speed, memory and fine motor coordination are likely permanent in nature. . . . [Although her] cognitive deficits . . . [appear to] generally range from mild to moderate impairment[,] . . . in daily functioning, her behavioral aspects of executive dysfunction (i.e. impulsivity, perseveration) exacerbate her impairment to the marked level. . . .

> Overall, [Plaintiff's] prognosis for obtaining or maintaining employment appears to be quite poor . . . . She would likely struggle even in a supportive environment.

(R. 721-22).

## C. Testimonial Evidence

During the administrative hearing on December 8, 2014, Plaintiff testified regarding her work history. Plaintiff has worked as a combat medic for the military. (R. 39). After working as a combat medic, Plaintiff did not work much because she is a single mother and experienced difficulty finding child care. (R. 38-39). Most recently, in the summer of 2012, Plaintiff worked at the Stonewall Resort Marina, where she rented boats to customers, assigned temporary boating licenses and "took care of the gift shop." (R. 38). Plaintiff worked at the marina for a "couple months" before she was involved in an accident on the way home from work and subsequently ceased working. (Id.).

Plaintiff testified that she suffers from multiple physical ailments. Specifically, Plaintiff suffers from a brain injury that affects her short-term memory. (See R. 50-51). As a result, she needs reminded "[a]ll the time" to perform tasks such as shut[ting] the well off[,] . . . put[ting] [any] leftovers away, closing they dryer or washer[,] [etc.]" (R. 50). While others offer prompts when necessary, Plaintiff also leaves herself notes around the house reminding her to do certain tasks. (R. 50-51). To illustrate, Plaintiff states:

> "[I]f I have . . . phone calls to make the next day, I won't remember to make them the next day unless I write a note and tape it to the back of my phone. So when I pick up the phone, the paper is there and reminds me to do it."

(R. 51). In addition to her brain injury, Plaintiff also suffers from constant hip pain and a knee impairment. (Id.). If she is walking on uneven ground, she must proceed slowly or else her knee "g[ives] out on [her]." (Id.). Plaintiff's fingers also "swell up if [she] use[s] [her] hands a lot." (Id.).

Finally, Plaintiff testified regarding her routine activities. Every day, Plaintiff sits at home and then spends time with her son in the evenings. (R. 42). During the week, she goes to doctors' appointments and/or to her mother's house. (Id.). She also plays with her pet dogs and straightens up her house. (R. 44). When "it's pretty" outside, she rides four-wheelers and dirt bikes.[9] (R. 43, 46).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Linda Dezack, an impartial vocational expert, also testified during the administrative hearing. (R. 52-56). Initially, Ms. Dezack responded to several hypothetical questions presented to her by the ALJ. In the first hypothetical question, the ALJ asked:

> [A]ssume a hypothetical individual with no past jobs. Further assume the individual is limited to work at the light exertional level except the work is with frequent postural[s] except no climbing of ladders, ropes, or scaffolds and except occasional balancing; no exposure to hazards, such as unprotected heights and moving mechanical parts; also, must be limited to simple, routine, and repetitive tasks.
>
> Can the hypothetical individual perform any work?

(R. 53). Ms. Dezack affirmed that such an individual could work as a pressing machine operator, cashier II or ticket seller. (R. 53-54). The ALJ then repeated the question with the added limitation that the individual is unable to perform "right upper extremity

---

[9] Plaintiff performs these activities against medical advice. (R. 46).

overhead reaching." (R. 54). Ms. Dezack replied that the same jobs would be available to the individual. (Id.). After the hypothetical questions, the ALJ asked Ms. Dezack questions regarding how much time employers generally allow employees to be unproductive. (R. 54-55). In response to these questions, Ms. Dezack testified that employers generally allow an employee to: (1) have one to two days of unexcused/unscheduled absences per month; (2) take three breaks during the workday and (3) be off task for up to ten percent of the workday. (Id.).

Plaintiff's counsel, Mr. Bailey, also presented questions for Ms. Dezack's consideration during the administrative hearing. (R. 55-56). Specifically, Mr. Bailey asked if an individual would be capable of competitive work if he or she: (1) required constant reminders to stay on task; (2) was twenty minutes late for work once a week; (3) required constant supervision or (4) required "constant reminders to remember the directions they were given." (Id.). Ms. Dezack responded that such an individual with any of the listed limitations would not be employable. (Id.).

### 2. Disability Reports and Report of Contact Forms

On August 29, 2012, Plaintiff submitted a Disability Report. (R. 208-14). In this report, Plaintiff indicated that she is unable to work due to a brain injury. (R. 209). She further indicated that she stopped working on June 12, 2012, "[b]ecause of [her] condition(s)." (Id.).

On January 25, 2013, M. Benedum, of the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form. (R. 231). On this form, M. Benedum reported that Plaintiff's date last insured ("DLI") was

extended to December 31, 2012. (Id.). M. Benedum reasoned that Plaintiff's "new hire query show[ed] lag wages of $2628 for 04/12 thru [sic] 06/12." (Id.).

On March 25, 2013, Linda C. Claypoole, a friend of Plaintiff's, submitted a Disability Report-Appeal form on behalf of Plaintiff. (R. 243-48). On this form, Ms. Claypoole stated that, in November of 2013, Plaintiff developed adhesive capsulitis of her shoulder. (R. 244-45). Ms. Claypoole further stated that Plaintiff had told her:

> [I] don['t] always remember to get my [hygiene] things [I] need and when it is that time of the month [I] have to [write] down on a dry erase board when [I changed] my pad and set an alarm clock that goes off to remind me to [change it]. [I]t is embar[rassing] and [I] don['t] leave the house unless [I] have to [I] don['t] see an empl[oyer] letting me take the measures [I] need to to make daily thing[s bearable] my mother and friend that lives with me helps . . . . [I] don['t] move my right arm much because of the adhesive capsulit[is], [I] don['t]cook because [I] forget about what [I] am cooking and [I] leave the burners on [I] don['t] go visit friends like [I] used to because [I] don['t] interact well with a bunch of people anymore o[r] if there are many things going on at once.

(R. 247). Finally, Ms. Claypoole listed Plaintiff's daily medications as the following: (1) Actolac for pain; (2) Ambien for sleep; (3) lactose for constipation; (4) loratidine for allergies; (5) Lyrica for pain; (6) meloxicam for pain; (7) Neurontin for pain and seizure control and (8) venlafaxine for regulation of brain chemicals.[10] (R. 246).

On July 1, 2013, C. Crawley, of the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a second Report of Contact form. (R. 260). On this form, C. Crawley reported that, although Plaintiff had appealed her denial of benefits at the Reconsideration Level, she had not submitted, inter alia, another Disability Report-Appeal form.[11] (Id.). Therefore, C. Crawley stated that he had

---

[10] However, on December 5, 2014, Plaintiff submitted an updated list of her medications, which included only Zoloft, Ambien and trazodone. (R. 261).

[11] The Disability Report-Appeal form dated March 25, 2013, was filed after Plaintiff appealed the denial of benefits at the Initial Level.

requested the missing information from Plaintiff but that he was transferring the case without the form. (Id.).

**E.    Lifestyle Evidence**

**1.  First Adult Function Report, September 3, 2012**

On September 3, 2012, Plaintiff submitted her first Adult Function Report. (R. 215-22). In this report, Plaintiff declares that she is unable to work because:

> I can['t] see well enough to drive to work[.] I have short term memory loss and I have to be release[d] by a neuropsychiatrist to drive, work, and live by myself.

(R. 215).

Plaintiff describes how her impairments impact her ability to perform some activities but not others. For some activities, Plaintiff requires minimal or no assistance. For example, Plaintiff is able to perform her own personal care. (R. 216). She is able to help with the care of her six-year-old son, explaining that she "do[es] what [she] can" for him and that a friend helps with the child's care. (Id.). She is able to perform housework such as washing laundry and vacuuming. (R. 217). She is able to go outside "when its [sic] cool." (R. 218). She is able to get along with authority figures. (R. 221). She is also able to pay bills, count change, handle a savings account and use a checkbook/money orders. (R. 218).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her impairments. Plaintiff's impairments affect her abilities to: lift, squat, walk, kneel, talk, climb stairs, see, recall information, concentrate and understand information. (R. 220). Plaintiff is easily confused and, as a result, experiences difficulty following instructions and needs reminded to take her medication. (R. 217, 220). She

19

also experiences difficulty talking because her vocal cords are scarred from previous intubation. (R. 220). She has difficulty balancing and is a fall risk. (Id.). She is limited to walking "about a tenth of a mile" before requiring approximately ten minutes of rest. (Id.). She is not able to operate a motor vehicle. (R. 218). She experiences difficulty sleeping. (R. 216).

Finally, Plaintiff details her daily activities. On a typical day, Plaintiff states that she "do[esn't] do much." (Id.). She further states that she only leaves her house if she is scheduled for a therapy or doctor's appointment. (Id.). Her daily medications include Celexa, hydrocodone and Ambien. (R. 222).

### 2. Third-Part Adult Function Report, February 18, 2013

On February 18, 2013, Rebecca Lowther, Plaintiff's mother, completed a Third-Party Adult Function Report form. (R. 232-39). On this form, Ms. Lowther reports:

> I am concerned about Amber not being able to smell and at th[is] point she can't smell if some[thing] was to happen like a fire or something[.] I hope all this changes as the brain heals[.] She has damage all through her brain all the way to the core[.] Some will reroute and other damage will stay the same. She [cannot] work like this. . . . Her vision is a big problem because she often see[s] double and has dizzy spells. Her short term memory loss is a problem . . . .

(R. 239).

Ms. Lowther describes how Plaintiff's impairments impact her ability to perform some activities but not others. Ms. Lowther declares that Plaintiff is able to perform her own personal care and household tasks with prompting. (R. 233-35). Ms. Lowther further declares that Plaintiff is able to care for her six-year-old son with the help of herself and Plaintiff's boyfriend. (R. 233). Ms. Lowther also states that Plaintiff is able to

cook on the stove and leave the house, although she requires supervision for both activities. (R. 234-35).

While Plaintiff is able to perform some activities, Ms. Lowther describes how others prove more difficult due to Plaintiff's impairments. Ms. Lowther lists the following as Plaintiff's impairments: a fractured and dislocated hip; shoulder ailments; a knee ailment that required surgery and a brain injury. (R. 237). Ms. Lowther reports that Plaintiff's impairments affect her abilities to: lift, squat, bend, stand, reach, walk, talk, see, recall information, complete tasks, concentrate, follow instructions and get along with others. (Id.). She describes Plaintiff as "very emotional" with "child like behavior." (R. 238). She also states that Plaintiff is short-tempered and argumentative at times. (R. 237). Additionally, she states that Plaintiff is easily sidetracked, experiences difficulty concentrating and understanding conversations and is a fall risk due to poor balance. (R. 235-35, 237).

Finally, Ms. Lowther details Plaintiff's daily activities. Specifically, Ms. Lowther states that Plaintiff, upon prompting and reminders, spends the day performing household tasks and activities. (R. 232). Ms. Lowther further states that Plaintiff goes outside every day. (R. 235).

### 3. Second Adult Function Report, April 25, 2013

On April 25, 2013, Plaintiff submitted her second Adult Function Report. (R. 250-57). In this report, Plaintiff explains that she has become more limited in her abilities since her last Adult Function Report. For example, Plaintiff declares:

> I don't remember the daily things I need to do[,] my memory loss is the problem . . . . I have dry erase boards everywhere and people remind me so how do I [work] for other people when I need help myself. . . . I can't work because I'm not [allowed] to drive, memory problems[.]

21

(R. 250, 257). She further declares that she suffers from double vision and severe headaches. (R. 253).

Plaintiff states that her impairments affect her abilities to: lift, squat, stand, walk, kneel, climb stairs, see, recall information, complete tasks, concentrate and understand information. (R. 255). She explains that she is "slow at processing things." (Id.). She further explains that, while she does not need to rest if she is walking on flat ground, she requires a few minutes of rest every ten feet if walking uphill or downhill. (Id.). She states that she is no longer able to handle a savings account or use a checkbook/money orders. (R. 253).

Finally, Plaintiff updated her routine activities. Every morning, Plaintiff awakens, eats breakfast and "help[s] around [the] house when reminded to do [household tasks]." (R. 251). She then "eat[s] other meals when [they're] ready" and plays with her son, going outside with him if the weather permits. (R. 251, 253).Linda Claypoole helps Plaintiff care for her son, reminding her "of [the] things [she] need[s] to do like check homework[,] bath[e] him, brush his teeth[,] e[tc]." (R. 251). Plaintiff lists Lyrica as her only daily medication.[12] (R. 257). At least once a week, Plaintiff spends time with others, during which they "s[it] around and talk [and] let the kids play [or] go out to eat." (R. 254).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

---

[12] In addition to medications, Plaintiff is prescribed eyeglasses/contacts, which she has worn every day since March of 2013. (R. 256).

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since June 12, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The following were considered severe: cognitive disorder secondary to traumatic brain injury; mood disorder not otherwise specified/adjustment disorder with mixed anxiety and depression; and, history of right hip dislocation (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the work: with frequent postural[s], except occasional balancing and no climbing of ladders, ropes or scaffolds; should avoid all exposure to hazards such as unprotected heights and moving mechanical parts; and, limited to simple, routine and repetitive tasks.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on January 18, 1986[,] and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 17-29).

## VI.   DISCUSSION

### A.   Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) improperly discredited the opinion of Jason Chong and (2) improperly relied on the opinions of "SSA-paid reviewing examiners." (Pl.'s Br. at 1). Plaintiff requests that the Court reverse the Commissioner's decision and remand the case for the calculation of benefits or, in the alternative, remand the case for further proceedings. (Pl.'s Mot. at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To

counter Plaintiff's arguments, Defendant contends that the ALJ: (1) properly weighed Jason Chong's opinion and (2) properly evaluated the state agency physicians' opinions. (Def.'s Br. at 4, 14). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

B.    **Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.      Analysis of the Administrative Law Judge's Decision**

Plaintiff challenges the ALJ's treatment of the medical opinions of record. An ALJ

must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of

Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When

weighing and evaluating these opinions, an ALJ often accords "greater weight to the

testimony of a treating physician" because the treating physician has necessarily

examined the claimant and has a treatment relationship with the claimant. Johnson v.

Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . .

does not require that the [treating physician's] testimony be given controlling weight."

Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a

physician's opinion is not supported by clinical evidence or if it is inconsistent with other

substantial evidence," then it should not be accorded controlling weight. Id. Additionally,

if a physician's opinion encroaches on an issue reserved to the Commissioner, including

the issue of whether a claimant meets the statutory definition of disability, then the

opinion should not be accorded controlling weight. 20 C.F.R. §§ 404.1527(d)(3) &

416.927(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an

ALJ must consider the factors detailed in 20 C.F.R. §§ 404.1527 and 416.927. 20

C.F.R. §§ 404.1527 & 416.927. These factors include: (1) whether the physician has

examined the claimant; (2) the treatment relationship between the physician and the

claimant, including the nature and extent of the treatment relationship; (3) the

supportability of the physician's opinion; (4) the consistency of the opinion with the

record; (5) whether the physician is a specialist and (6) any other factor that tends to

support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. §§ 404.1527 and 416.927, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[,] [that determination] generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x. 264, 267 (4th Cir. 2015) (internal citations omitted). With these rules in mind, the undersigned will examine each of Plaintiff's specific challenges.

### 1. Whether the ALJ Improperly Discredited the Opinion of Jason Chong

Plaintiff argues that the ALJ improperly discredited the opinion of Jason Chong, Psy.D. (Pl.'s Br. at 6). Defendant argues that the ALJ properly evaluated Dr. Chong's opinion and that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 4).

The ALJ accorded "less than great weight" to the medical opinion of Dr. Chong contained in the Neuropsychological Evaluation dated November 1, 2014. (R. 25).

Initially, the ALJ noted that Dr. Chong concluded in the Neuropsychological Evaluation that Plaintiff possesses "marked difficulties, for example, in daily activities and maintaining concentration, persistence or pace" and that Plaintiff "would likely do poorly in obtaining and/or maintaining employment." (Id.). The ALJ then declined to accord the opinion controlling weight, noting that Dr. Chong was not one of Plaintiff's treating physicians. (Id.). Subsequently, the ALJ reasoned that the opinion was entitled to less than great weight because:

> First, it is emphasized that [Plaintiff] underwent the examination that formed the basis of the report not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored. Next. Dr. Chong appeared to readily dismiss [Plaintiff's] statements of no abnormality or at most mild abnormality, and chose to rely heavily, if not primarily, upon statements of third parties, such as [Plaintiff's] mother, which were in direct contradiction and with which possible bias could not be dismissed. In addition, Dr. Chong's report contrasts so sharply with, and is without substantial support from, other evidence of record, including records of those having seen [Plaintiff], including for treatment purposes, on more than on[e] occasion, which obviously renders it less persuasive.

(R. 25-26).

The undersigned finds that the ALJ properly evaluated Dr. Chong's opinion. After deciding not to accord the opinion controlling weight, the ALJ proceeded to consider the five factors listed in 20 C.F.R. §§ 404.1527 and 416.927. While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, his consideration of the factors is obvious by his statements that Plaintiff "underwent . . . examination" by Dr. Chong (factor one), Plaintiff did not seek treatment from Dr. Chong but was referred to him by her attorney (factor two), Dr. Chong's opinion contrasts with other evidence in the record and is without substantial support (factors three and four)

and Dr. Chong possesses a "Psy.D.," meaning that he is a Doctor of Psychology, a specialist (factor five). (Id.). Moreover, the ALJ provided his reasons for according the opinion less than great weight, which are sufficiently specific. Therefore, the ALJ followed proper procedure when according Dr. Chong's opinion less than great weight.

Plaintiff attacks the ALJ's reasons for discrediting Dr. Chong's opinion on several grounds. First, Plaintiff challenges the ALJ's consideration of the fact that Plaintiff was referred to Dr. Chong by her attorney. (Pl.'s Br. at 9). Plaintiff reasons that the ALJ was required to "introduce evidence of actual improprieties" and should not have "assume[d] that doctors routinely lie in order to help their patients collect disability benefits." (Id.). The undersigned finds that this argument has little merit. When determining how much weight to assign a medical opinion that is not entitled to controlling weight, an ALJ is required to consider the nature of the relationship between the opining health care provider and the claimant (factor two). 20 C.F.R. §§ 404.1527(c)(2) and 20 C.F.R. 6.927(c)(2). Accordingly, the ALJ appropriately noted in the present case that Plaintiff presented to Dr. Chong "through attorney referral," "not in an attempt to seek treatment for symptoms." (R. 25). In other words, the ALJ was noting that Mr. Chong was not a treating source whose opinion would be entitled to more weight, not inferring that Mr. Chong was biased. Snider v. Comm'r of Soc. Sec., 328 F. Supp. 2d 703, 708-09 (E.D. Mich. 2004) ("A treating physician's opinion should be given greater weight than those opinions of consultative physicians who are hired for the purpose of litigation and who examine the claimant only once."). Moreover, while the ALJ documented that Plaintiff presented to Dr. Chong for litigation purposes only and not for treatment, the ALJ did not disregard Dr. Chong's opinion for this reason. Instead, the ALJ noted that, despite

the circumstances surrounding Mr. Chong's examination of Plaintiff, the evidence obtained during the examination "is certainly legitimate and deserves due consideration." (R. 26). Therefore, any error that may have occurred was harmless and Plaintiff's argument lacks merit.

Second, Plaintiff challenges the ALJ's statement that Dr. Chong's opinion "rel[ied] heavily, if not primarily, upon statements of third parties, such as [Plaintiff's] mother, which were in direct contradiction [with Plaintiff's own statements and] with which possible bias could not be dismissed." (Pl.'s Br. at 8). Plaintiff argues that Plaintiff's mother constituted a "knowledgeable informant" whose statements should not render Dr. Chong's opinion less reliable. (Id.). The undersigned finds that this argument has little merit. The ALJ noted that the statements of Plaintiff's mother directly contracted Plaintiff's statements and chose to credit Plaintiff over her mother, which the undersigned believes was reasonable.[13] Moreover, the ALJ did not discredit Dr. Chong's opinion solely because the opinion relied upon statements of third parties. Therefore, any error that occurred was harmless in nature.

Third, Plaintiff challenges the ALJ's statement that Dr. Chong's opinion is without substantial support from the record. (Pl.'s Br. at 6; Pl.'s Resp. at 6). Instead, Plaintiff argues that "[t]he ALJ seemed to ignore and disregard evidence that supported Dr. Chong," specifically pointing to Dr. Warshowsky's neurological evaluation of Plaintiff. (Pl.'s Br. at 6). The undersigned disagrees. An ALJ is required to *consider* all of the

---

[13] Plaintiff argues that the statements of Plaintiff's mother were more trustworthy than Plaintiff's own statements because Plaintiff's "insight into her condition is poor." (Pl.'s Br. at 8). However, in his written opinion, the ALJ noted that "[i]n September 2012, [Plaintiff] underwent neuropsychological evaluation . . . [in which her i]nsight, concentration, and persistence were good." (R. 23). The ALJ also noted that, [i]n January 2013, . . . [Plaintiff] was oriented in all spheres and exhibited fair insight." (Id.). Therefore, substantial evidence supports the ALJ's decision to credit Plaintiff's statements over that of her mother's.

relevant medical evidence submitted by a claimant. 20 C.F.R. § 416.920. However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). In the present case, Dr. Warshowsky performed a neurological evaluation of Plaintiff while she was undergoing rehabilitation at the Shepherd Center. (R. 534-36). Dr. Warshowsky explicitly noted in his evaluation that he was assessing Plaintiff "to determine [her] current level of cognitive functioning for treatment and discharge planning purposes" but that she should be re-evaluated "in 11-12 months to gauge cognitive recovery." (R. 534, 536). Accordingly, because Dr. Warshowsky's evaluation is most relevant to a specific, limited period of time, the undersigned believes that the ALJ acted reasonably in choosing to not explicitly comment on the evaluation.

Finally, Plaintiff argues that ALJ erroneously "rel[ied] on his own interpretation of [Plaintiff's] activities of daily living as evidence to discount medical expert opinion."[14] (Pl.'s Br. at 11). The undersigned disagrees. Although the ALJ did not explicitly address this issue in his reasons for discrediting Dr. Chong's opinion, it is obvious from the written decision that, despite Dr. Chong's opinion that Plaintiff possesses marked difficulties in her daily activities, the ALJ deemed that opinion unsupported and

---

[14] Plaintiff points to on Forquer v. Colvin, No. 1:15CV57, 2016 WL 4250364 (N.D. W. Va. Aug. 11, 2016), to support her argument. However, Forquer is factually distinguishable from the instant case. In Forquer, the ALJ rejected every expert opinion of record without explaining the evidence on which he relied. Forquer, 2016 WL 4250364, at *8. Instead of offering an explanation, the ALJ simply "emphasize[d] [Plaintiff's] activities of daily living." Id. Thus, the Court held that an "ALJ cannot merely rely on activities of daily living – just one of the special factors – to substitute his own opinion for that of the experts." In the present case, the ALJ considered not one but each of the special factors when evaluating Dr. Chong's opinion.

inconsistent with the record. In his written decision, the ALJ determined that Plaintiff does not suffer from an impairment or combination of impairments that "is likely to impose more than a mild limitation upon her ability to carry our daily activities."[15] (R. 19). Subsequently, the ALJ noted that, by "her discharge [from Ruby Memorial Hospital] on July 31, 2012," Plaintiff required only "minimal assistance for daily living" and that the record reflected that Plaintiff, *inter alia*, performs her own personal care independently, actively participates in the care of her young child, maintains a boyfriend/fiancé and operates dirt bikes, which Plaintiff does not refute. (R. 22, 27). Accordingly, the undersigned finds that the ALJ's determination that Plaintiff possesses only mild limitation in her activities of daily living is supported by substantial evidence. The ALJ, therefore, did not substitute his own medical opinion for that of Dr. Chong's but instead showed that Dr. Chong's opinion is inconsistent with and unsupported by the record. Consequently, the ALJ's decision to accord Dr. Chong's opinion less than great weight is supported by substantial evidence.

### 2. Whether the ALJ Improperly Relied on the Opinions of the State Agency Physicians

Plaintiff argues that the ALJ improperly relied on the opinions of the state agency physicians. (Pl.'s Br. at 12). To support this argument, Plaintiff contends that the state agency physicians "cannot reasonably win the battle of factors in 20 CFR § 404.1527." (Id. at 13-14). Defendant argues that the ALJ properly evaluated the opinions of the state agency physicians and that the state agency physicians' opinions are supported

---

[15] This statement was made at step three of the sequential evaluation process. The undersigned notes that the ALJ did not improperly form his own medical opinion but was required to evaluate the degree of Plaintiff's functional limitations at step three, which includes an evaluation of Plaintiff's daily activities. Moreover, the undersigned notes that Plaintiff does not contest the ALJ's step three determination or the reasoning he provided for the determination.

by and consistent with the evidence of record. (Def.'s Br. at 14).

The Code of Federal Regulations declares that state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i) & 416.927(e)(2)(i). Therefore, when evaluating the opinion of a state agency physician, the Code of Federal Regulations requires an ALJ to treat a state agency opinion as any other opinion and consider it in light of the factors laid out in 20 C.F.R. §§ 404.1527 and 416.927. Id. at §§ 404.1527(e)(2)(ii) & 416.927(e)(2)(ii).

The ALJ accorded "great weight" to the opinions of the state agency physicians. (R. 24). Initially, the ALJ noted that the state agency medical consultants opined that Plaintiff is "capable of a range of light exertional work, with additional nonexertional limitations" and that the state agency psychological consultants opined, *inter alia*, that at most Plaintiff possesses "only a mild restriction as to activities of daily living, a mild restriction as to maintaining social functioning, and a moderate restriction in concentration, persistence or pace, having experienced no episodes of decompensation of extended duration." (R. 24-25). Subsequently, the ALJ reasoned that the opinions were entitled to great weight because:

> [Regarding the opinions of the state agency medical physicians, a]lthough not in lockstep agreement, the opinions are consistent with and supported by the objective evidence of record, and supportive of the limitations afforded to [Plaintiff] within this decision. Although non-examining sources, the opinions were bolstered by the objective findings reflective of improvement and stability as fully discussed above,[16] as well as the report

---

[16] Plaintiff argues that the ALJ failed to cite to specific evidence to support his reasons for crediting the state agency physicians. (Pl.'s Resp. at 13). However, The ALJ discussed the evidence of record and supported his findings in his summarization of the evidence that he discussed prior to his decision to credit the opinions, which is sufficient. See Parsons v. Astrue, No. CIV.A. 5:07-CV-00784, 2009 WL 688216, at *15 (S.D. W. Va. Mar. 13, 2009) (stating that, although the ALJ did not cite specific evidence in his reasons for discrediting a medical opinion,

of the State agency consultative examiner finding essentially no abnormality aside from some mild restriction in range of motion of the right shoulder. The opinions . . . were balanced, supportable, not inconsistent with the record, and provided by experts familiar with the regulations and evidentiary requirements who had an opportunity to review the case record. . . .

[Regarding the opinions of the state agency psychological physicians, t]he opinions were balanced, supportable, not inconsistent with the record, and provided by experts familiar with the regulations and evidentiary requirements who had an opportunity to review the case record.

(R. 22-25).

The undersigned finds that the ALJ properly evaluated the state agency physicians' opinions. While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, his consideration of the factors is obvious by his statements that the state agency physicians were "non-examining sources" (factor one), the state agency opinions were supportable and not inconsistent with the record (factors three and four) and the state agency physicians are experts familiar with the regulations (factor five). Moreover, the ALJ provided his reasons for according the opinions great weight, which are sufficiently specific. Therefore, the ALJ followed proper procedure when according the state agency opinions great weight.

Plaintiff argues that the opinions of state agency physicians "cannot reasonably win the battle of factors in 20 CFR § 404.1527."[17] (Pl.'s Br. at 13-14). Plaintiff supports her argument by performing her own analysis of the factors that differs from the ALJ's

---

"the [reasons were] clear from the ALJ's prior summary of the evidence").

[17] Plaintiff also stresses that, in his Psychological Evaluation of Plaintiff, Dr. Klein, a state agency psychologist, noted that his evaluation "was not intended to supplant the findings of the neuropsychological evaluations[, including Dr. Chong's medical opinion]." (Pl.'s Br. at 9). However, Dr. Klein's statement does not mean that the ALJ was erroneous as a matter of law for according more weight to the state agency opinions than to Dr. Chong's opinion. To the contrary, it is the responsibility of the ALJ to weigh the evidence of record and to make credibility determinations. See 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).

analysis. (Id.). However, the Court's role is not to undertake its own analysis of the factors or to substitute its judgment, or Plaintiff's judgment, for that of the ALJ's. Instead, the Court is restricted to ensuring that the ALJ followed the proper procedure and that the ALJ's findings are supported by substantial evidence. The undersigned has already determined that the ALJ followed proper procedure and applied the proper legal standards when evaluating the state agency opinions. Now, the undersigned finds that the ALJ's decision to accord greater weight to the opinions of the state agency physicians than to Dr. Chong's opinion is supported by substantial evidence. (See, e.g., R. 24-25) (listing the ALJ's reasons for crediting the state agency opinions). Indeed, Plaintiff does not challenge or dispute any of the ALJ's reasons for according the state agency opinions great weight.

The undersigned also notes that, despite Plaintiff's argument, courts have routinely upheld decisions by ALJs to accord more weight to state agency opinions than treating physician opinions. See, e.g., Tanner v. Comm'r of Soc. Sec., 602 F. App'x 95, 101 (4th Cir. 2015) (upholding an ALJ's "decision to accord more weight to the opinions of . . . agency consultants than to the opinions of . . . treating physicians [because they were] . . . supported by the medical evidence as a whole"); Brannon v. Astrue, No. 6:11-CV-00320, 2012 WL 3598407, at *2 (S.D. W. Va. Aug. 21, 2012) (finding that the ALJ was justified in giving more weight to the state agency physician than the treating physician). Consequently, the ALJ's decision to accord the state agency opinions great weight is supported by substantial evidence.

## VII.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's applications for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures

for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 7th day of April, 2017.

_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE